# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Melissa Garcia,<br><br>        Plaintiff,<br><br>   -v-<br><br>Westhampton Primary Care, Maria Barlowe, Marie Alessi, and StaffCo of Brooklyn, LLC<br><br>        Defendants. | 2:23-cv-4319<br>(NJC) (ST) |

## CORRECTED OPINION AND ORDER[1]

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Melissa Garcia ("Garcia") brings this action against Westhampton Primary Care, Inc. ("Westhampton Primary Care"), Maria Barlowe[2] ("Barlowe"), Marie Alessi[3] ("Alessi"), and StaffCo of Brooklyn, LLC ("StaffCo") (collectively, "Defendants"). The Second Amended Complaint—the operative pleading in this action—alleges that Defendants discriminated against

---

[1] This Corrected Opinion and Order corrects the Court's August 30, 2025 Memorandum and Order (ECF No. 60), which failed to address controlling case law interpreting the statutory definitions of "employer" under Title VII and the NYSHRL. *See* Fed. R. Civ. P. 54(b) (providing that any order that does not result in a final judgment "may be revised at any time before the entry of judgment adjudicating all claims"); *Esposito v. Suffolk Cnty. Comm. Coll.*, 517 F. Supp. 3d 126, 134 (E.D.N.Y. 2021) ("*Sua sponte* reconsideration is appropriate where there is a need to correct a clear error or prevent manifest injustice . . ."); *see also Acha v. Beame*, 570 F.2d 57, 63 (2d Cir. 1978) (holding that whether "revision" is appropriate under Rule 54(b) "is within the sound discretion of the trial judge"). Accordingly, the August 30, 2025 Memorandum and Order is vacated, and this Corrected Opinion and Order sets forth the entirety of the Court's ruling on Defendants' Motions to Dismiss (ECF Nos. 38, 39).

[2] The Second Amended Complaint uses the spellings "Barlowe" and "Barlow." I understand both of these spellings to be referring to the same person.

[3] The Second Amended Complaint uses the spellings "Alessi" and "Allessi." I understand both of these spellings to be referring to the same person.

Garcia on the basis of her race, exposed her to a hostile work environment, and retaliated against her, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. (Second Am. Compl. ("SAC"), ECF No. 29.) It also alleges that Barlowe and Alessi aided and abetted Defendants' racially hostile and retaliatory conduct in violation of the NYSHRL, N.Y. Exec. Law § 290. (*Id.*)

Before the Court are two Motions to Dismiss the Second Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.")—one filed by the state-owned Defendant Westhampton Primary Care ("Westhampton Primary Care's Motion to Dismiss") and one filed by Defendants Barlowe, Alessi, and StaffCo (the "Individual Defendants") ("Individual Defendants' Motion to Dismiss"). (Westhampton Primary Care Mot. Dismiss, ECF No. 38; Individual Defs.' Mot. Dismiss, ECF No. 39.)

As explained below, I grant in part and deny in part both Motions, as follows:

**(1) Disparate Treatment Claims.** As a threshold matter, the Second Amended Complaint fails to allege a plausible Title VII or NYSHRL discrimination claim on a disparate treatment theory. Accordingly, to the extent that Garcia intended to bring any such claims in the Second Amended Complaint, I dismiss them under Rule 12(b)(6).

**(2) Primary Liability.** Westhampton Primary Care and StaffCo can be held primarily liable as "employers" under Title VII and the NYSHRL. However, the Second Amended Complaint does not plausibly allege that Barlowe and Alessi are "employers" under these statutes and, accordingly, there is no plausible Title VII or NYSHRL hostile work environment or retaliation claim against Barlowe or Alessi for primary liability. Thus, to the extent that Garcia

2

intended to bring any Title VII or NYSHRL hostile work environment or retaliation claims against Barlowe or Alessi for primary liability, I dismiss these claims. With respect to the Title VII claims against Barlowe and Alessi, I dismiss these claims with prejudice because, under the Second Circuit's holding in *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995), "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII." Thus, amendment to bring Title VII claims against Barlowe and Alessi would be futile. With respect to the NYSHRL, however, I grant Garcia leave to further amend the Second Amended Complaint to allege facts concerning Barlowe and/or Alessi's status as "employers" under the NYSHRL in order to cure the identified deficiencies.

**(3) Secondary Liability.** Garcia's NYSHRL secondary liability claims against Barlowe and Alessi survive the Individual Defendants' Motion to the extent that, as set forth below, the Second Amended Complaint plausibly alleges that each "actually participated" in the unlawful conduct.

**(4) Hostile Work Environment Claims.** I deny dismissal of Garcia's Title VII hostile work environment claims against Westhampton Primary Care and StaffCo, Garcia's NYSHRL primary liability hostile work environment claims against Westhampton Primary Care and StaffCo, and Garcia's NYSHRL secondary liability hostile work environment claims against Barlowe and Alessi. Despite the fact that some of the allegations are untimely under the relevant limitations periods, the "continuing violation" doctrine applies to these hostile work environment claims. Further, the Second Amended Complaint alleges sufficiently severe or pervasive conduct under Title VII. It also alleges sufficient facts to plausibly allege that Westhampton Primary Care liable for the conduct of non-supervisory employees.

3

**(5) Retaliation Claims.** I dismiss Garcia's retaliation claims in part because, as set forth below, some of the alleged retaliatory acts are untimely and not saved by the "continuing violation" doctrine and some of the allegations lack a sufficient causal nexus to any alleged protected activity. Nevertheless, Garcia's Title VII and NYSHRL retaliation claims against Westhampton Primary Care and StaffCo for primary liability and her NYSHRL retaliation claims against Barlowe for secondary liability survived the Rule 12(b)(6) Motions. The Second Amended Complaint plausibly alleges that Barlowe retaliated against Garcia in the weeks and months following her complaints about her coworker's alleged racially biased actions and that Barlowe again retaliated against Garcia in the months following Garcia's filing of an October 5, 2022 formal charge with the Equal Employment Opportunity Commission ("EEOC"). However, the Second Amended Complaint fails to allege facts supporting a plausible NYSHRL retaliation claim against Alessi for secondary liability. Further, as with Garcia's hostile work environment claims, the Second Amended Complaint alleges sufficient facts to hold Westhampton Primary Care liable for retaliation based on the conduct of non-supervisory employees.

## BACKGROUND

The following facts are taken from the Second Amended Complaint. (SAC.)

Garcia is a mixed-race woman who identifies as Black and Hispanic. (*Id.* ¶ 5.) Westhampton Primary Care is a medical group specializing in neuromusculoskeletal medicine. (*Id.* ¶ 6.) Garcia has been employed as a Licensed Practical Nurse at Westhampton Primary Care since December 2016. (*Id.* ¶ 10.) In addition to being employed by Westhampton Primary Care, Garcia has also at certain points been a patient of Westhampton Primary Care, receiving treatment for "a chronic nerve condition." (*Id.*)

4

StaffCo is an external human resources vendor contracted to provide services to Westhampton Primary Care. (*Id.* ¶ 7.) According to the Second Amended Complaint, Westhampton Primary Care "was staffed by StaffCo." (*Id.* ¶ 10.) Barlowe was hired as Westhampton Primary Care's Office Manager in 2017, making her Garcia's direct supervisor. (*Id.* ¶¶ 8, 12.) Alessi is Westhampton Primary Care's Off-Site Manager and Barlowe's supervisor. (*Id.* ¶¶ 9, 35.)

The Second Amended Complaint describes numerous instances in which Jennifer Crump ("Crump"), another Licensed Practical Nurse, witnessed Vanessa Cyphers ("Cyphers"), the Front Desk Associate, use racial slurs and make other racially offensive remarks. In 2019 or 2020, Crump heard Cyphers refer to a colleague as a "nigger." (*Id.* ¶ 13.) Cyphers also referred to Dominque Roberts ("Roberts"), the Union Representative, as a "super black ghetto bitch" and a "ghetto black version" of a certain former employee at Westhampton Primary Care. (*Id.*) Cyphers also told Crump that "Black people don't like Dobermans," in response to a comment made by Crump that she did not like dogs. (*Id.*) Another time, after hearing that the brother of a Black coworker was featured in the newspaper, Cyphers asked whether it was because he murdered somebody. (*Id.*) Since "Barlowe had not been receptive to other concerns that Crump had brought to her in the past," Crump reported the incidents directly to upper management. (*Id.*) Cyphers was subsequently fired, although, according to the Second Amended Complaint, the reason for her termination is not clear. (*Id.*)

The Second Amended Complaint also alleges racially hostile behavior by Sherri Durand ("Durand"), a Medical Assistant hired in late-2020 or early-2021. (*Id.* ¶ 14.) Since the beginning of her employment, Durand was "hostile and disrespectful" to minority coworkers, including

Shanike Chambers ("Chambers") and Francis Ilacqua ("Ilacqua").[4] (*Id.* ¶ 15.) For instance, Durand would "aggressively throw or snatch papers from them, stomp and mutter comments while walking away, and was generally rude" to them, while she did not treat white coworkers this way. (*Id.* ¶ 15.) In February or March 2021, Garcia and Ilacqua complained to Gina Sardella ("Sardella"), the Nursing Supervisor, about Durand's behavior, and Sardella subsequently held a meeting with all three individuals. (*Id.* ¶ 16.) At the meeting, Durand "denied everything" and accused Garcia and Ilacqua of lying, and Sardella ultimately decided not to investigate further and "just told everybody to get along." (*Id.*)

Around September 2021, Garcia asked Durand to correct some paperwork related to a patient, and Durand "became enraged and scream[ed] about it in the presence of patients." (*Id.* ¶ 19.) Around the same time, Garcia and Chambers overhead Durand say something to the effect of "Blacks will never amount to anything" and "All of the Spanish are illegals." (*Id.* ¶ 20.) Garcia complained to Barlowe, after which Barlowe held a meeting with Durand. (*Id.* ¶¶ 20–21.) On October 7, 2021, Chambers sent an email informing Barlowe that she had overheard Durand say that Black people "will never turn[] out to be anything in life, unless they are mixed with white and that all Spanish people are illegal." (*Id.* ¶ 22.)[5]

Also on October 7, 2021, Medical Assistant Sage Hervan ("Hervan") told Garcia that Durand was "making threats against" Garcia, including that she was "coming for [Garcia]'s

---

[3] The Second Amended Complaint uses the spellings "Ilacqua" and "Illacqua." I understand both of these spellings to refer to the same person.

[5] It is unclear from the face of the Second Amended Complaint whether Chambers' email recounts the same September incident previously described, or a different incident in which Durand made similar comments.

blood" and that she "would take [Garcia] down with her" if she was terminated. (*Id.* ¶ 23.)
Garcia brought this information to Barlowe's attention, and Barlowe refused to take action,
claiming that Durand was "all talk" and that if Garcia "just ignored her she would go away."
(*Id.*)

> Later that same day, Garcia sent Barlowe the following email:
>
> Today while I was in the hallway Sherri MA stated she is "coming for my blood, this is a full on war and if she leaving she's taking me with her." Also two weeks ago i overheard her state to whom I do not know that black people will not amount to anything unless they are half white and that all Spanish people are illegal. I am half Spanish and my family is black as well, i do not feel comfortable at all working with someone who has such ill will against people of color or any race.
>
> I am forwarding this email to you because I wanna know what is going on with this situation at work, I am working in a very hostile environment. So I would like to know what are the next steps I have to take to have something done. I wanna know if this matter is going to be taken care of and is this going to brought to Dr. Weinbaum attention. Thank you I hope you have a great day.

(*Id.* ¶ 24.) Garcia also forwarded this email to Alessi, the Off-Site Manager. (*Id.* ¶ 25.) Alessi
then spoke to Barlowe regarding what, if anything, Barlowe was doing to address the concerns
raised. (*Id.*) More than one week later, on October 18, 2021, Durand resigned without having
been disciplined. (*Id.* ¶ 26.)

Following Garcia's complaints, Barlowe "began soliciting [Garcia's] coworkers for
negative information that she could use as a basis to terminate [Garcia]." (*Id.* ¶ 27.) Specifically,
Barlowe sought negative information from Hervan, who subsequently complained to the union
on October 21, 2021, writing:

> This past Monday 10/18/21, Maria Barlowe called me into her office to talk. She opened the conversation. with Sherri's 2 week notice letter, and that we were "losing another good employee because of Melissa". She proceeded to ask me how we could "get rid" of Melissa and that she was a toxic person in this office.

She asked me if I knew of anything Melissa was doing wrong and if so, she
wanted me to document it.

She kept saying that she can't get rid of Melissa because she has no proof of
anything that she's doing wrong (maybe because she's not, right?). But kept
saying she needs to find a way to get rid of her and if I do not help her I am part
of the problem. "How can I get rid of Melissa if no one will speak up". She kept
pushing for me to say something, to find something, maybe even make up
something about Melissa that could give her the leverage she needed to fire her.

Maria was visibly upset and frustrated during this encounter, and made me feel
that I was doing something wrong by not wanting to dig up information and write
a statement against Melissa. She made me feel that I somehow was making the
situation worse by not having any negative information to document about
Melissa. It was an extremely uncomfortable encounter. . . .

Gina Sardella the nursing supervisor was present for this entire conversation.

(*Id.* ¶ 28.)

In late October 2021, Garcia met with the Union Representative and Barlowe regarding
Barlowe's attempts to solicit negative feedback about Garcia. (*Id.* ¶ 29.) At the meeting, the
Union Representative advised Barlowe that her actions constituted unlawful retaliation and could
result in a lawsuit; however, Barlowe denied ever attempting to solicit negative feedback about
Garcia. (*Id.*)

Nevertheless, following the October 2021 meeting with the Union Representative and
Garcia, Barlowe actually increased her attempts to solicit negative information about Garcia—
bringing the issue up at subsequent meetings and "instruct[ing] the front desk staff to watch
when Melissa came and left and report back to her." (*Id.* ¶ 30.) Barlowe also assigned Garcia to
cover all of the late shifts, in violation of Westhampton Primary Care's internal protocols and the
applicable collective bargaining agreement, which require that the most junior medical assistants
cover these shifts. (*Id.* ¶ 32.) Garcia complained to HR, which "did not promptly address" her

8

concerns, and subsequently complained to the union, which resolved the matter in Garcia's favor before she had to begin working the late shifts. (*Id.* ¶ 34.) Around the same time—presumably October 2021—someone from the office told Garcia that Barlowe asked an individual named Dr. Aponte to "monitor [Garcia] carefully," in particular to see if she came back from lunch on time and if she was impermissibly using her cell phone during work hours. (*Id.* ¶ 33.) The Second Amended Complaint alleges that Dr. Aponte then began treating Garcia differently, including yelling at her in front of patients on one occasion. (*Id.*)

In late-October 2021, Barlowe told Alessi that Durand quit because of Garcia and said that two employees have left because of Garcia's "toxicity." (*Id.* ¶ 35.) In her discussion with Alessi, Barlowe "described [Garcia's] complaint and another anonymous complaint to corporate compliance as constituting Barlowe 'being assaulted.'" (*Id.*) Barlowe also told other employees about Garcia's purported "toxicity." (*Id.* ¶ 39.)

In November 2021, Alessi came to Westhampton Primary Care and interviewed Garcia regarding her complaints. (*Id.* ¶ 36.) During the interview, Garcia informed Alessi that "Durand had long treated minority nurses with contempt, made racially biased comments, and had made threats against [Garcia] following her complaints to Barlow." (*Id.*) Alessi informed Garcia that Durand had resigned; Garcia responded stating that, since Westhampton Primary Care was part of a "broader network," it was still possible that Durand could be hired by another office within the network. (*Id.*) According to the Second Amended Complaint, Alessi was "dismissive" during the interview and did not conduct any further interviews or investigation into the issues raised. (*Id.*)

Garcia's experiences at work caused her "stress and anxiety," which, in turn, exacerbated

her pre-existing nerve condition. (*Id.* ¶ 40.) As a result, she took a medical leave of absence from December 27, 2021 to June 28, 2022. (*Id.* ¶¶ 40–41.) Shortly after Garcia returned to work, Barlowe "went out of her way to try to blame" Garcia for an error in which an employee incorrectly reported a positive COVID result to a patient. (*Id.* ¶ 42.)

In July 2022, Barlowe learned that Garcia was the only applicant for an open Care Coordinator position and attempted to convince several other more senior employees to apply for the job, in an apparent effort to ensure that Garcia would not be promoted. (*Id.* ¶ 43.) In March 2023, Barlowe instructed Michelle Dirma ("Dirma"), another Licensed Practical Nurse, not to speak to Garcia, after discovering that Garcia had provided Dirma advice on how to handle a situation involving racial discrimination at work. (*Id.* ¶ 44.)

As of the filing of the Second Amended Complaint, Westhampton Primary Care "has not taken any appropriate remedial action to address Durand's discrimination or Barlowe's retaliation." (*Id.* ¶ 45.)

## PROCEDURAL HISTORY

On June 12, 2023, Garcia filed the Complaint in this action, and the case was initially assigned to District Judge Dora Lizette Irizarry. (Compl., ECF No. 1; Elec. Notice, June 13, 2023.) On July 18, 2023, Garcia filed an Amended Complaint, which Judge Irizarry struck because Garcia filed it without the Court's leave and prior to service of the original Complaint, in violation of Rule 15(a), Fed. R. Civ. P. (Stricken Am. Compl., ECF No. 5; Elec. Order, Aug. 1, 2023.) On August 28, 2023, after serving Defendants with the original pleading, Garcia re-filed the Amended Complaint, in compliance with Rule 15(a). (Am. Compl., ECF No. 12.)

On October 25, 2023, the case was reassigned to my docket. (Elec. Notice, Oct. 25,

10

2023.) On November 13, 2023, Defendants filed letter motions seeking a pre-motion conference in anticipation of their motions to dismiss the Amended Complaint. (Individual Defs.' Ltr. Mot., ECF No. 20; Westhampton Primary Care Ltr. Mot., ECF No. 21.) Garcia filed an opposition letter on November 17, 2023 (Garcia Opp'n Ltr., ECF No. 23), and on December 20, 2023, I found that a pre-motion conference was unnecessary and set a briefing schedule (Scheduling Order, ECF No. 27). The scheduling order specifically provided Garcia an opportunity to further amend her pleading no later than February 14, 2024.

On December 22, 2023, Garcia filed a Second Amended Complaint. (SAC.) On December 28, 2023, Garcia filed a letter representing that the Second Amended Complaint contained only one substantive change from the Amended Complaint and the parties agreed that the previously set briefing schedule should remain in place. (Garcia Ltr., ECF No. 30.)

Pursuant to the briefing schedule, Defendants timely filed their fully briefed Motions to Dismiss on the docket, including: (1) Westhampton Primary Care's memorandum in support of its Motion (Westhampton Primary Care Mem., ECF No. 38-3); (2) the Individual Defendants' memorandum in support of their Motion (Individual Defs.' Mem., ECF No. 39-2); (3) Garcia's consolidated brief in opposition to Westhampton Primary Care's and the Individual Defendants' Motions (Garcia Opp'n, ECF Nos. 38-6, 39-5); (4) Westhampton Primary Care's reply brief (Westhampton Primary Care Reply, ECF No. 38-7); and (5) the Individual Defendants' reply brief (Individual Defs.' Reply, ECF No. 39-5).

## LEGAL STANDARDS

A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (quoting *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009)). In determining if a claim is sufficiently plausible to withstand dismissal under Rule 12(b)(6), a court "accept[s] all factual allegations . . . as true" and "draw[s] all reasonable inferences in the plaintiff's favor." *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023). Nevertheless, a court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 307 (2d Cir. 2022). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *accord Schiebel v. Schoharie Central Sch. Dist.*, 120 F.4th 1082, 1106 (2d Cir. 2024). While "detailed factual allegations" are not required, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. A complaint fails to state a claim "if it tenders naked assertions devoid of further factual enhancement." *Id.*

## DISCUSSION

Westhampton Primary Care moves to dismiss the Second Amended Complaint under Rule 12(b)(6) on multiple grounds. First, Westhampton Primary Care argues that Garcia's claims against it are time-barred because the alleged conduct took place more than 300 days before Garcia filed a complaint with the New York City Division of Human Rights ("NYSDHR") and the EEOC. (Westhampton Primary Care Mem. at 4.) Second, Westhampton Primary Care argues that the Second Amended Complaint fails to state a hostile work environment claim because the alleged facts "do[] not reach the level of severity or pervasiveness to state a claim." (*Id.* at 8.) Third, Westhampton Primary Care seeks dismissal of the hostile work environment claim against

it on the ground that it fails to impute any wrongdoing to the State University of New York ("SUNY"), the state entity that runs Westhampton Primary Care. (*Id.* at 9.) Fourth, it argues that Garcia's retaliation claims should be dismissed because the Second Amended Complaint fails to allege a protected activity or an adverse employment action. (*Id.* at 9–12.)

The Individual Defendants move to dismiss the Second Amended Complaint under Rule 12(b)(6) on similar, though not completely overlapping, grounds. First, the Individual Defendants argue that the Second Amended Complaint does not state a claim for disparate treatment because it does not allege an adverse employment action[6] and because it does not allege circumstances giving rise to an inference of discrimination. (Individual Defs.' Mem. at 7–10.) Second, the Individual Defendants argue that the Second Amended Complaint fails to state a hostile work environment claim because it fails to allege sufficient severe or pervasive harassment and because it fails to allege that race was the cause of the alleged conduct. (*Id.* at 10–12.) Third, the Individual Defendants seek to dismiss Garcia's retaliation claims on the grounds that the Second Amended Complaint does not allege a sufficiently "material" adverse action. (*Id.* at 13–16.)

In opposition, Garcia only addresses the Second Amended Complaint's hostile work environment and retaliation claims, apparently conceding that the Second Amended Complaint

---

[6] The parties filed their fully briefed Motions approximately one month before the Supreme Court issued its decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), in which the Supreme Court held that Title VII's adverse employment action requirement for disparate treatment claims does not require showing that the adverse action was significant or material. Nevertheless, since I find that the Second Amended Complaint does not plead a disparate treatment claim—only hostile work environment and retaliation claims—I do not reach the issue of whether the alleged adverse action satisfies the *Muldrow* standard. *See infra* Discussion Section I.

does not plead plausible disparate treatment claims under Title VII or the NYSHRL. (*See* Garcia Opp'n.) With respect to Westhampton Primary Care's statute of limitations argument, Garcia argues that her Title VII claims are timely under the "continuing violation" doctrine and that, even if the Title VII claims are untimely, the NYSHRL claims fall within the applicable three-year statute of limitations. (*Id.* at 21–23.) Concerning Westhampton Primary Care's threshold argument that it cannot be held liable for the conduct of Garcia's non-supervisory coworkers, Garcia argues that this is an affirmative defense inappropriate for resolution on a motion to dismiss and that, in any event, Westhampton Primary Care cannot establish that it exercised reasonable care to correct Garcia's coworkers' conduct or had in place any "preventative policy." (*Id.* at 23.)

As to the hostile work environment claims, Garcia argues that the Second Amended Complaint adequately pleads that she experienced a hostile work environment as a result of her race and national origin,[7] citing alleged statements made by Cyphers and Durand, as well as Barlowe's alleged failure to take action to address the environment created by such statements. (*Id.* at 3–8.) Garcia also argues that the Second Amended Complaint plausibly alleges that she faced a hostile work environment in retaliation for her engagement in "protected activities,"

---

[7] In her opposition brief, Garcia mentions for the first time that she brings a claim on the basis of national origin. (Opp'n at 3.) The Second Amended Complaint brings discrimination claims only on the basis of race. (SAC ¶¶ 47–48.) Garcia's characterization of her discrimination claims as falling under Title VII's "national origin" provision appear to relate to her Hispanic ethnicity. (Garcia Opp'n at 3 n.2.) Garcia relies on *Village of Freeport v. Barrella*, where the Second Circuit held that, while "Hispanic ethnicity or lack thereof may also be cognizable under the rubric of national-origin discrimination, depending on the particular facts of each case," at a minimum, "race" under Title VII encompasses Hispanic ethnicity. 814 F.3d 594, 607 (2d Cir. 2016). Accordingly, I consider Garcia's hostile work environment claims based on her Hispanic ethnicity as claims based on "race" under Title VII and the NYSHRL.

14

although Garcia's opposition brief does not precisely identify which of the numerous alleged

protected activities gave rise to the retaliatory hostile work environment. (*Id.* at 8–10.)

As to her claim that Defendants subjected her to discrete acts of retaliation, Garcia

identifies multiple alleged protected activities: (1) her September 2021 complaint to Barlowe

about Durand's behavior; (2) her October 7, 2021 verbal complaint to Barlowe and follow-up

email to Barlowe and Alessi about Durand's threats; (3) her late-October meeting with the Union

Representative about Barlowe's attempts to solicit negative feedback against Garcia; (4) her late-

October complaint to HR that Barlowe had improperly assigned her to cover all late shifts; and

(5) her November 2021 interview with Alessi about her complaints. (*Id.* at 13–15.) Garcia also

identifies numerous alleged retaliatory actions, including that Defendants: (1) "permit[ed] an

employee to say that she was 'coming for [Garcia's] blood' and 'would take [Garcia] down,'"

(2) "pressure[ed]" coworkers to submit negative information to use as a basis to terminate

Garcia, (3) actively monitored Garcia for a basis for termination, (4) assigned Garcia to the late

shift, (5) told other employees that Garcia was the reason certain coworkers got fired, (6)

"chang[ed]" their "demeanor and attitude" towards Garcia, (7) "create[ed] such a stressful

environment that [Garcia] needed a leave," (8) falsely accused Garcia of being at fault for a

patient receiving an incorrect positive COVID test result, (9) took steps to block Garcia from

receiving a promotion, (10) demanded that an employee stop speaking with Garcia, and (11)

failed to discipline Durand[8] or note on her separation form that she was not subject to rehire. (*Id.*

---

[8]  In her opposition, Garcia refers to Defendants' alleged "fail[ure] to discipline *Barlowe* or note
on her separation form that she's not subject to rehire." (Garcia Opp'n at 17 (emphasis added).)
Based on the allegations of the Second Amended Complaint, however, I understand Garcia to be
referring to Durand, not Barlowe. (*See* SAC ¶ 36.)

at 16–17.) Garcia argues that the Court can infer a causal connection between the alleged protected activities and the alleged retaliatory conduct because (1) Barlowe's solicitation of negative feedback "may be viewed as directly reflecting the alleged retaliatory attitude," (2) the alleged retaliatory conduct is sufficiently close in time to the alleged protected activities, (3) the facts alleged show a "departure[] from normal procedures," and (4) the facts alleged show "disparate treatment of similarly situated employees." (*Id.* at 19–21.)

For the reasons explained below, I grant in part and deny in part the Motions under Rule 12(b)(6) as follows. To the extent the Second Amended Complaint attempts to allege any Title VII and NYSHRL disparate treatment claims, I dismiss these claims. I also dismiss the Second Amended Complaint's claims alleging that Barlowe and Alessi are primarily liable as "employers" under Title VII and the NYSHRL, but grant Garcia leave to amend to allege facts showing that Barlowe and Alessi are "employers" under these statutes. I deny dismissal of the Title VII hostile work environment claims against Westhampton Primary Care and StaffCo, the NYSHRL primary liability hostile work environment claims against Westhampton Primary Care and StaffCo, the NYSHRL secondary liability hostile work environment claims against Barlowe and Alessi, and the NYSHRL secondary liability retaliation claims against Barlowe. I dismiss a portion of Garcia's retaliation claims under Title VII and NYSHRL because some of the alleged retaliatory acts are untimely and some lack a sufficient causal nexus to the underlying protected activity and because the Second Amended Complaint fails to plead sufficient facts to support a plausible NYSHRL retaliation claim against Alessi for secondary liability.

## I.    Scope of Claims

As a threshold matter, the Second Amended Complaint is unclear as to the precise scope

of Garcia's claims. I address these ambiguities below and establish which claims apply to which Defendants.

### A.  Disparate Treatment Claims

The Second Amended Complaint does not bring any discrimination claims under Title VII or the NYSHRL on a disparate treatment theory. It only brings hostile work environment and retaliation claims.

It appears that Garcia did not intend to bring any disparate treatment claims. The Second Amended Complaint refers to claims for "Discrimination and Retaliation" and describes these claims as arising from "adverse actions and a hostile work environment . . . on the basis of [Garcia's] race and her protected activities." (SAC ¶¶ 47–48.) In their opening brief, the Individual Defendants separately argue that the Court should dismiss Garcia's "discrimination" claims (Individual Defs.' Mem. at 7), "hostile work environment" claims (*Id.* at 10), and "retaliation" claims (*Id.* at 13). In opposition, Garcia does not address the Individual Defendants' arguments with respect to any "discrimination" claims, whether characterized as disparate treatment or otherwise, and only addresses the arguments relating to her hostile work environment and retaliation claims. (*See generally* Garcia Opp'n.) Accordingly, I find that Garcia did not intend to bring any disparate treatment claims in the Second Amended Complaint. Regardless, in failing to oppose the Individual Defendants' Motion on this point, Garcia has forfeited any arguments that her disparate treatment claims, to the extent there are any, survive a Rule 12(b)(6) analysis. *See In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023) ("Since this issue is adverted to only in a perfunctory manner, unaccompanied by any effort at developed argumentation, it must be deemed waived . . . or, more precisely, *forfeited*." (emphasis in

original)).

Further, even if Garcia *did* intend to bring disparate treatment claims, the Second Amended Complaint does not adequately plead such claims. The Second Amended Complaint's only allegation that plausibly relates to a disparate treatment claim concerns the treatment of Chambers and Ilacqua, not Garcia: "Durand would aggressively throw or snatch papers from [Chambers and Ilacqua], stomp and mutter comments while walking away, and was generally rude. *Durand did not treat her Caucasian co-workers in this manner*." (SAC ¶ 15 (emphasis added).) This sole allegation regarding the disparate treatment of *non-parties* is insufficient to state a claim under Title VII or the NYSHRL challenging the disparate treatment of *Garcia*.

To the extent that Garcia seeks to bring a disparate treatment claim based on the Second Amended Complaint's allegation that Barlowe attempted to reassign Garcia to cover all late shifts, this claim fails for at least two reasons. (SAC ¶ 34.) First, the Second Amended Complaint explains that this alleged potential adverse action never materialized because the union resolved the matter with Garcia's employer. (*Id.*) Second, the Second Amended Complaint contains no allegation that Barlowe's attempt to reassign Garcia was because of Garcia's *race* and, in fact, specifically alleges that it was done in *retaliation* for Garca's complaints. (*See id.* ¶ 32 ("[I]n further retaliation, Barlowe assigned Melissa to cover all of the late shifts . . .").)

For these reasons, the Second Amended Complaint fails to state a claim for disparate treatment under Title VII or the NYSHRL. As Garcia has already had two opportunities to amend her initial Complaint to include a disparate treatment claim, I do not permit Garcia leave to amend with respect to any such claim.

**B.  Hostile Work Environment and Retaliation Claims: Primary Liability**

The Second Amended Complaint is likewise unclear as to which entities and individuals are Defendants in the hostile work environment and retaliation claims. In particular, the Second Amended Complaint specifies that Garcia brings claims against Barlowe and Alessi for "aiding and abetting" liability under the NYSHRL but does not identify the specific Defendant(s) against whom Garcia brings Title VII and NYSHRL claims for primary liability. (*See* SAC ¶¶ 47–48.)

Title VII permits a plaintiff to bring hostile work environment and retaliation claims only against "employers," not other employees. 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a). Title VII defines "employer" as, in relevant part, "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). Notwithstanding the inclusion of "agent" in the definition, the Second Circuit has held that "individual defendants"—even those exercising "supervisory control" over a plaintiff employee—"may not be held personally liable under Title VII." *Tomka*, 66 F.3d at 1313; *see also Yerdon v. Poitras*, 120 F.4th 1150, 1156 (2d Cir. 2024) (affirming *Tomka*'s holding and extending it to the statutory definition of "employer" under Title I).

The NYSHRL also prohibits discriminatory conduct and retaliation by an "employer," although the statutory definition is less clear. N.Y. Exec. L. §§ 296(1), (7). The NYSHRL definition section provides that "[t]he term 'employer' shall include all employers in the state." N.Y. Exec. L. § 292(5).

Given the circularity of the NYSHRL's definition, the New York Court of Appeals has articulated different standards concerning what constitutes an "employer" under the statute. New

19

York courts have long applied a four-factor balancing test to determine whether a defendant is an "employer" under the NYSHRL, which considers whether the alleged employer controls: (1) "the selection and engagement of the servant"; (2) "the payment of salary or wages"; (3) "the power of dismissal"; and (4) "the power of control of the servant's conduct." *State Div. of Hum. Rts. on Complaint of Emrich v. GTE Corp.*, 109 A.D.2d 1082, 1083 (4th Dep't 1985); *Wang v. Phoenix Satellite Television US, Inc.*, 976 F. Supp. 2d 527, 533 (S.D.N.Y. 2013) (applying *GTE Corp.* balancing test); *see also Griffin v. Sirva Inc.*, 835 F.3d 283, 289 (2d Cir. 2016) (acknowledging that "New York courts have provided balancing tests to determine whether an entity is an 'employer'" under the NYSHRL). In *Griffin v. Sirva, Inc.*, the New York Court of Appeals, addressing a certified question from the Second Circuit, affirmed the application of the above-described balancing test and further explained that "common-law principles . . . determine who may be liable as an employer under section 296(15) of the Human Rights Law, with greatest emphasis placed on the alleged employer's power 'to order and control' the employee in his or her performance of work." 29 N.Y.3d 174, 186 (2017).

Four years later, in *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450 (2021), the New York Court of Appeals addressed whether a *corporate* defendant was an "employer" under New York *City* Human Rights Law, but nevertheless stated in dicta that "[a] corporate employee, though [the employee] has a title as an officer and is the manager or supervisor of a corporate division . . . is not individually subject to suit with respect to discrimination based on age or sex under New York[] [State] Human Rights Law." *Id.* at 459 The dicta at issue was an attempt to clarify *Patrowich v. Chemical Bank*, 63 N.Y.2d 541 (1984), where the New York Court of Appeals previously held: "A corporate employee, though he has a title as an officer and is the manager or

20

supervisor of a corporate division, is not individually subject to suit with respect to discrimination based on age or sex under New York[] [State] Human Rights Law or [] Labor Law or under the Federal Age Discrimination in Employment Act or Equal Pay Act if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Id.* at 542. *Bloomberg* appears to suggest that this rule in *Patrowich* applies *only* to the federal definition of "employer"—not to the state law definition, even though *Patrowich* expressly referenced the New York State Human Rights Law and New York Labor Law. This commentary in *Bloomberg* likely does not alter the New York Court of Appeals' test for determining whether a corporate employee is an "employer" under the New York State Human Rights law as set forth in *Griffin* because this issue was not before the court in *Bloomberg*, which specifically addressed corporate liability (not individual liability) for violations of New York City Human Rights Law (not the NYSHRL). Nevertheless, neither party has identified, much less briefed, this legal question.

Here, Defendants do not dispute that Westhampton Primary Care and StaffCo are covered by the "employer" definitions in Title VII and the NYSHRL. (*See generally* Westhampton Primary Care Mem., Westhampton Primary Care Reply, Individual Defs.' Mem., Individual Defs.' Reply.) Accordingly, the Second Amended Complaint brings hostile work environment claims under Title VII and the NYSHRL against both of these entities.

By contrast, the Second Amended Complaint includes no allegations that Barlowe or Alessi are "employers" under Title VII or the NYSHRL, despite the fact that Garcia appears to suggest in her opposition brief that the Second Amended Complaint brings primary liability hostile work environment claims against Barlowe as a "supervisor." (Opp'n at 8–10.) With

21

respect to Title VII's statutory definition, the Second Amended Complaint identifies both Barlowe and Alessi as employees. (*See* SAC ¶ 8 (alleging that Barlowe is the Office Manager); SAC ¶ 9 (alleging that Alessi is the Off-Site Manager).) Additionally, in the "Claim for Relief" section of the Second Amended Complaint, neither Barlowe nor Alessi are even named in Paragraph 47, which concerns the "First Cause of Action – Against Care Center and StaffCo (Title VII – Discrimination and Retaliation)." (*Id.* ¶ 47.) Accordingly, as individual employees of Westhampton Primary Care and StaffCo, Barlowe and Alessi may *not* be held liable as "employers" under Title VII. *Tomka*, 66 F.3d at 1313. The Second Amended Complaint likewise does not allege that Barlowe or Alessi is an "employer" under the standards set forth by the New York Court of Appeals in *Griffin* and New York appellate decisions. In particular, the Second Amended Complaint contains no allegations addressing whether Barlowe and/or Alessi had any authority over the "selection and engagement" of Garcia as an employee or the "payment of salary or wages," "dismissal," or "control over [Garcia's] conduct," aside from alleging in a general fashion that Barlowe was Garcia's "direct superior" and that Barlowe had some ability to adjust Garcia's work schedule. *See* SAC ¶¶ 12, 32; *GTE Corp.*, 109 A.D.2d at 1083; *Griffin*, 29 N.Y.3d at 186.

Given these inadequacies, the Second Amended Complaint does not state plausible Title VII or NYSHRL claims for primary liability against Barlowe or Alessi. In light of the Second Circuit's clear holding in *Tomka* that individual employees cannot be "employers" under Title VII, it would be futile for Garcia to further amend her Title VII claims against Barlowe and Alessi, and thus I do not permit Garcia to further amend the Second Amended Complaint to address these deficiencies. Given caselaw concerning the NYSHRL definition of "employer," it

is unlikely that Garcia can amend the Second Amended Complaint to allege that Barlowe and/or Alessi are employers under the NYSHRL under the *Griffin* test. Nevertheless, out of an abundance of caution, I grant Garcia leave to file a third amended complaint to allege facts supporting primary liability claims against Barlowe and/or Alessi under the NYSHRL and will accordingly permit Defendants to identify any basis for dismissal of these claims under Rule 12(b)(6). *See* Rule 15(a)(2), Fed. R. Civ. P. (setting forth a lenient standard under which "[t]he court should freely give leave [to amend] when justice so requires").

### C.  Hostile Work Environment and Retaliation Claims: Secondary Liability

The Second Amended Complaint brings secondary liability claims against Barlowe and Alessi under the NYSHRL, alleging that they aided and abetted the hostile work environment and retaliation perpetuated by Westhampton Primary Care and StaffCo. (SAC ¶¶ 47–48.) The Individual Defendants argue in their briefing that Barlowe and Alessi cannot be held liable under the NYSHRL for aiding and abetting for the following reasons: (1) Barlowe and Alessi cannot be held secondarily liable for their own violations of the NYSHRL; (2) there is no underlying NYSHRL violation for Barlowe and Alessi to aid and abet; and (3) the Second Amended Complaint fails to state a claim for aiding and abetting liability under the NYSHRL because Barlowe and Alessi did not actually participate in the alleged conduct giving rise to Garcia's claims. (Individual Defs.' Mem. at 16–18.) Garcia does not make any arguments in opposition to any of these three points. (*See generally* Garcia Opp'n.) Accordingly, I treat the Individual Defendants' Motion to Dismiss the aiding and abetting claims as unopposed and test their arguments only for their legal sufficiency. *See McCall v. Pataki*, 232 F.3d 321, 322–23 (2d Cir. 2000).

Section 296(6) of the NYSHRL provides: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so"—including creating a hostile work environment or engaging in retaliation. N.Y. Exec. L. § 296(6). The New York Court of Appeals has instructed that the NYSHRL aiding and abetting "provision should be construed broadly." *Griffin v. Sirva, Inc.*, 858 F.3d 69, 70–71 (2d Cir. 2017) (reporting response to certified question by the New York Court of Appeals). Accordingly, a non-employer individual who "actually participates" in the alleged discriminatory or retaliatory conduct can be held secondarily liable under the NYSHRL. *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021).

As an initial matter, the Individual Defendants are correct that Barlowe and Alessi cannot be held both primarily liable and secondarily liable for the same NYSHRL violations. Individual Defs.' Mem. at 16; *see also Boonmalert v. City of New York*, 721 F. App'x 29, 34 (2018) ("[A]n individual cannot aid and abet their own discriminatory conduct."). As I have held above, on the facts alleged, Barlowe and Alessi cannot be held primarily liable for their alleged conduct under the NYSHRL because the Second Amended Complaint does not allege that either is an "employer" under the statute. If Garcia elects to further amend her pleading, as set forth above, and states a claim for a primary violation of the NYSHRL by Barlowe and/or Alessi, then she could not also bring claims against them for a secondary violation of the NYSHRL. But the mere fact that the Second Amended Complaint fails to plausibly allege *primary liability* claims against Barlowe and Alessi under Title VII or the NYSHRL does not preclude Garcia from bringing *secondary liability* claims against them under the NYSHRL's aiding and abetting provision.

As to the plausibility of Garcia's secondary liability claims, the Second Amended

24

Complaint plausibly states a claim against Barlowe and Alessi for aiding and abetting a hostile work environment. As discussed further below in Discussion Sections II.B.iii and II.D.iii, the Second Amended Complaint alleges that Barlowe "actually participated" in creating the hostile work environment by, among other things, discussing with other coworkers her plan to "get rid" of Garcia, pressuring others to write negative reviews against Garcia, telling coworkers that other employees left because of Garcia's "toxicity," falsely blaming Garcia for an error on a COVID test, spreading negative information about Garcia to Dr. Aponte which resulted in Dr. Aponte treating Garcia differently, and attempting to block Garcia from a promotion. (SAC ¶¶ 27–45.) The Second Amended Complaint also alleges that Alessi "actually participated" in sustaining the hostile work environment by, among other things, failing to investigate, or otherwise properly address, Garcia's complaints. *Id.* ¶ 25 (alleging that Alessi contacted Barlowe to discuss Garcia's complaints); *id.* ¶ 36 (alleging that Alessi interviewed Garcia about her complaints but was "dismissive, and did not conduct any further interviews in connection with [Garcia's] complaints, or otherwise further investigate"); *id.* ¶ 36 (alleging that Alessi told Garcia that Durand was leaving Westhampton Primary Care and that this should resolve the matter). These allegations, read in the context of the entire Second Amended Complaint, are sufficient to plausibly allege NYSHRL hostile work environment secondary liability claims against Barlow and Alessi. *See Griffin*, 858 F.3d at 71 (recognizing the New York Court of Appeals' instruction that the NYSHRL aiding and abetting provision should be "construed broadly"); *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (upholding denial of summary judgment on NYSHRL aiding and abetting claim in part because there was a triable issue of fact over whether the defendants "took no action to [address the alleged discriminatory conduct] although they

25

were aware of it").

The Second Amended Complaint also states a claim against Barlowe for aiding and abetting retaliation but does not state such a claim against Alessi. As noted above, the Second Amended Complaint alleges that Barlowe "actually participated" in the alleged retaliation, including by discussing with other coworkers her plan to "get rid" of Garcia, pressuring others to write negative reviews against Garcia, telling coworkers that other employees left because of Garcia's "toxicity," falsely blaming Garcia for an error on a COVID test, spreading negative information about Garcia to Dr. Aponte which resulted in Dr. Aponte treating Garcia differently, and attempting to block Garcia from a promotion. (SAC ¶¶ 27–45.) But the Second Amended Complaint does not allege any such facts with respect to Alessi. In fact, it does not even allege that Alessi was aware of Barlowe's retaliatory actions, much less that she aided and abetted them. (*See generally* SAC.)

Therefore, I deny dismissal of the NYSHRL aiding and abetting hostile work environment claims against Barlowe and Alessi, as well as the NYSHRL aiding and abetting retaliation claim against Barlowe. I grant dismissal of the NYSHRL aiding and abetting retaliation claim against Alessi.

## II. Failure To State a Claim

### A. Hostile Work Environment Claims

Westhampton Primary Care argues that Garcia's hostile work environment claims are untimely and that the Second Amended Complaint does not impute the alleged conduct to SUNY, the state-owned entity that controls Westhampton Primary Care. The Individual Defendants argue that the Second Amended Complaint fails to state a hostile work environment

claim because it fails to allege that race was the cause of the alleged hostile work environment. All Defendants argue that the alleged conduct does not rise to the level of severity or pervasiveness sufficient to state a claim. I address each argument in turn.

### i. Timeliness

Title VII requires the plaintiff to file a charge with the EEOC within either 180 or 300 days of the alleged unlawful employment practice, with the longer timeframe applying when a plaintiff has first instituted proceedings with a state or local agency with authority to grant or seek relief. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).[9]  The EEOC charge timing requirement "operates as a statute of limitations." *Banks v. General Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023). The Second Amended Complaint alleges that Garcia initially filed a complaint with the New York State Division of Human Rights; accordingly, the 300-day limitations period applies. (SAC ¶ 4.) Under the NYSHRL, a plaintiff must file a complaint with the New York State Division of Human Rights within three years of the alleged unlawful employment practice. N.Y. Exec. Law § 297(5).

Notwithstanding these limitations periods, under the so-called "continuing violation" doctrine, "it does not matter that some of the component acts of the hostile work environment fall outside the statutory time period"; so long as "an act contributing to the claim occurs within

---

[9] Title VII provides two statutory deadlines for filing an EEOC charge. 42 U.S.C. § 2000e-5(e)(1). In general, the plaintiff must file the EEOC charge within 180 days of the alleged unlawful employment practice. *Id.* However, where the plaintiff "has initially instituted proceedings with a State or local agency with authority to grant or seek relief from [the unauthorized employment] practice," the plaintiff must file the EEOC charge within 300 days of the alleged unlawful employment practice. *Id.*

the filing period, *the entire time period* of the hostile work environment may be considered by a court for the purposes of determining liability." *Banks*, 81 F.4th at 260 (emphasis supplied). In other words, "a charge alleging a hostile work environment claim will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period*." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (quoting *Morgan*, 536 U.S. at 122).

Still, despite this relatively lenient standard, "the timely incident must be sufficiently related to the prior events so that they can be said to be part of the 'same' hostile work environment." *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 91 (2d Cir. 2014) (citing *Morgan*, 526 U.S. at 118); *see also Dziedzic v. State Univ. of N.Y. at Oswego*, 648 F. App'x 125, 127–28 (2d Cir. 2016) ("continuing violation" doctrine did not apply where untimely sexual joke "was made by different co-workers in a different section of the paint department than the [timely] harassment" alleged); *Sooroojballie v. Port Auth. of N.Y. and N.J.*, 816 F. App'x 536, 541–42 (2d Cir. 2020) ("continuing violation" doctrine applied where "non-discrete acts" of "lack of training, evaluations, and discipline" occurred both inside and outside of the statutory period); *James v. Van Blarcum*, 782 F. App'x 83, 84–85 (2d Cir. 2019) ("continuing violation" doctrine applied where similar racial comments were made both inside and outside of the statutory period). Further, while the Second Circuit has not yet endorsed a specific test for determining whether alleged harassing acts are "sufficiently related," district courts have considered factors that include: "(1) whether the timely and untimely harassment is of a similar nature, (2) whether the same individuals perpetuated the harassment, (3) the frequency and temporal proximity of the acts, and (4) whether the employer took any intervening remedial

action." *Bonterre v. City of New York*, No. 18-cv-745, 2021 WL 4060358, at *3 (S.D.N.Y. Sept. 7, 2021).

With respect to Garcia's Title VII claims, the Second Amended Complaint alleges that Garcia filed the EEOC charge on October 5, 2022. (SAC ¶ 4.) Accordingly, Garcia's hostile work environment claims under Title VII are untimely with respect to alleged incidents that occurred prior to December 9, 2021 (i.e., 300 days prior to the filing of the EEOC charge). The Second Amended Complaint alleges that the following events occurred outside of this time period; thus, they are untimely, unless the "continuing violation" doctrine applies: (1) Cypher's use of racial slurs and racially insensitive language, which the Second Amended Complaint alleges occurred "[i]n 2019 or 2020" (SAC ¶ 13); (2) Durand's alleged racially hostile behavior in late-2020 or early-2021 (*id.* ¶¶ 14–16); (3) the alleged September 2021 incidents in which Durand yelled at Garcia in front of patients and in which Garcia overheard Durand make racially offensive remarks (*id.* ¶¶ 19–20); (4) Durand's alleged threats against Garcia in October 2021 and Barlowe's refusal to take action (*id.* ¶ 23); and (5) Barlowe's alleged actions to solicit negative feedback about Garcia and to spread rumors about her being the cause of coworkers' resignations in October and November 2021 (*id.* ¶¶ 27–39); and (6) Barlowe's alleged assignment of Garcia to all late shifts (*id.* ¶ 34). The following alleged events are timely: (1) Barlowe's alleged retaliatory actions that resulted in Garcia taking a medical leave of absence on December 27, 2021, to the extent that those actions occurred on or after December 9, 2021 (*id.* ¶¶ 40–41); (2) Barlowe going "out of her way" to falsely blame Garcia for a patient receiving an incorrect COVID test result at some point after Garcia's return from her medical leave on June 28, 2022 (*id.* ¶ 42); (3) Barlowe's alleged attempts to block Garcia from receiving a promotion

29

by seeking other more senior applicants in July 2022 (*id.* ¶ 43); and (4) Barlowe's alleged instruction to Dirma to not speak to Garcia in March 2023 (*id.* ¶ 44).

With respect to Garcia's NYSHRL claims, the Second Amended Complaint alleges that Garcia also filed a New York State Division of Human Rights complaint on October 5, 2022. (*Id.* ¶ 4.) Accordingly, Garcia's hostile work environment claims under the NYSHRL are untimely with respect to alleged incidents that occurred prior to October 5, 2019 (i.e., three years prior)— again, unless the "continuing violation" doctrine applies. All of the events alleged in the Second Amended Complaint fall within this window, except potentially for Cypher's use of racial slurs and racially insensitive language, which the Second Amended Complaint alleges occurred "[i]n 2019 or 2020" (*Id.* ¶ 13).

Nevertheless, I find that, under both Title VII and the NYSHRL, the "continuing violation" doctrine applies and the otherwise untimely alleged events are sufficiently related to the alleged timely events to form the same alleged hostile work environment. *See Morgan*, 526 U.S. at 118. First, the untimely alleged harassment is of a similar nature to the timely harassment—for example, Barlowe's alleged refusal to take action in response to Durand making racially offensive comments and threatening Garcia (untimely under Title VII) is part of the same series of events leading to Barlowe's alleged solicitation of negative feedback about Garcia in response to her complaints about Durand's behavior (timely under Title VII). *See Bonterre*, 2021 WL 4060358, at *3. Second, there is some overlap in the individuals who engaged in the alleged harassing behavior; in particular, Barlowe engaged in the alleged conduct both before and after the expiration of the limitations period under Title VII. *See id.* Third, the Second Amended Complaint alleges that the acts occurred frequently from 2019 through the filing of the

initial Complaint in 2023, with the exception of the period in which Garcia was on medical leave. *See id.* Fourth, the Second Amended Complaint specifically alleges that Garcia's employer failed to take appropriate remedial action throughout this period. *See id.* Accordingly, the "continuing violation" doctrine applies with respect to Garcia's Title VII and NYSHRL hostile work environment claims, and thus Garcia may pursue hostile work environment claims on the basis of all facts alleged in the Second Amended Complaint.

### ii. *Title VII Hostile Work Environment Claim*

A hostile work environment claim under Title VII requires a plaintiff to show that her workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of his or her employment were thereby altered." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020); *see also Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998) (holding that Title VII is not "a general civility code" but rather "forbids only behavior so objectively offensive as to alter the conditions of the victim's employment"). This inquiry "involves both objective and subjective elements." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009). To prevail on a hostile work environment claim, the plaintiff must show (1) that the alleged conduct was "severe or pervasive enough to create an *objectively* hostile or abusive work environment" and (2) that the plaintiff "*subjectively* perceive[d] that environment to be abusive." *Id.* (emphasis added). In the objective inquiry, courts assess the totality of circumstances, weighing various factors, including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). The plaintiff must prove that

31

she faced "harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse"; in this inquiry, however, the Second Circuit has cautioned against "setting the bar too high." *Id.*

A plaintiff may bring a Title VII claim alleging a hostile work environment on the basis of the plaintiff's protected characteristic or in retaliation for engaging in a protected activity. *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 179 (2d Cir. 2023). To plead a race-based hostile work environment claim, the plaintiff must allege that her membership in a protected class caused her to experience a hostile work environment. *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting adverse employment actions "*because of* such [employee's] race, color, religion, sex, or national origin" (emphasis added)); *Patane*, 508 F.3d at 112. In other words, courts apply a "but-for" causation test to determine whether the plaintiff would have experienced the same hostile work environment had he not been a member of the protected class at issue—here, Garcia's race and ethnicity. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020). To plead a retaliatory hostile work environment claim, the plaintiff must show that her engagement in a protected activity caused her to face a hostile work environment. *Carr*, 76 F.4th at 178–80. Protected activities include not only formal charges of discrimination, but also broadly any "oppos[ition] [to] any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e–3(a); *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012). The plaintiff must also plead facts showing that the hostile work environment was "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Carr*, 76 F.4th at 179.

Here, the Second Amended Complaint plausibly alleges that Garcia faced a hostile work

environment both because of her race and because of her engagement in protected activities. With respect to Garcia's claim that she faced a racially hostile work environment, the Second Amended Complaint plausibly alleges that she faced harassment that was both severe and pervasive. (*See, e.g.*, SAC ¶ 13 (alleging multiple instances of racially offensive remarks by Cyphers); *id.* ¶¶ 15–16 (alleging multiple instances of Durand treating Garcia and another minority employee with "hostility and disrespect" in front of patients); *id.* ¶ 19 (alleging that Durand screamed at Garcia in front of patients); *id.* ¶ 20 (alleging that Durand stated that "Blacks will never amount to anything" and "All of the Spanish are illegals," and that Garcia heard these statements); *id.* ¶ 23 (alleging that Durand said that she was "coming for [Garcia's] blood").) Further, the Second Amended Complaint alleges that race was the cause of the hostile work environment, in particular because many of the alleged comments described above directly showed racial animus. *Id.* ¶¶ 13, 22; *see Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 149 (2d Cir. 2024) (holding that "statements . . . may be viewed as directly reflecting the alleged discriminatory attitude").

With respect to Garcia's claim that she faced a retaliatory hostile work environment, the Second Amended Complaint plausibly alleges, at a minimum, that she engaged in protected activities when she reported Durand's threats and racially charged statements on October 7, 2021 (SAC ¶ 23) and when she filed an EEOC charge on October 5, 2022 (*id.* ¶ 4). It also alleges that Garcia faced severe and pervasive harassment—in particular by Barlowe—following one or both of these protected activities. (*See, e.g.*, *id.* ¶¶ 27–39 (alleging that Barlowe repeatedly pressured Garcia's co-workers to provide negative feedback about her); *id.* ¶ 34 (alleging that Barlowe improperly assigned Garcia to cover every late shift, in violation of company policy and the

applicable collective bargaining agreement); *id.* ¶ 42 (alleging that Barlowe went "out of her way" to falsely blame Garcia for a patient receiving an incorrect COVID test result); *id.* ¶ 43 (alleging that Barlowe attempted to block Garcia from receiving a promotion); *id.* ¶ 44 (alleging that Barlowe instructed Dirma not to speak to Garcia).) The Second Amended Complaint plausibly states a causal relationship between the protected activity and the harassing behavior, including because it alleges that Barlowe specifically sought advice from Hervan regarding how to "get rid" of Garcia and told Alessi that "two people have left because of [Garcia's] toxicity." (*id.* ¶¶ 28, 35.) Further, at the motion to dismiss stage, the plaintiff may rely on temporal proximity between the alleged protected activity and the alleged retaliation to make a prima facie showing of retaliation. *See Zann Kwan v. Andalex Grp.*, *LLC*, 737 F.3d 834, 845 (2d Cir. 2013); *see, e.g.*, SAC ¶¶ 23, 34 (alleging that Garcia complained on October 7, 2021 and Barlowe reassigned Garcia's shift in late October 2021).

Defendants' arguments that the alleged conduct was not sufficiently severe or pervasive to state a hostile work environment claim are unavailing. Westhampton Primary Care's argument that the statements made by Cyphers and Durand, which Garcia either overheard or learned second-hand, "were not directed at [Garcia]" (Westhampton Primary Care Mem. at 8) is incorrect for two reasons. First, it is well-settled that racially hostile actions need not be within the presence of the plaintiff or directed at the plaintiff in order to contribute to a hostile work environment. *See Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) ("[W]e recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination."). Second, as a factual matter, some of the alleged statements by Durand *were* "directed at" Garcia—for example,

34

Durand's comment that she was "coming for [Garcia's] blood." (SAC ¶ 23.) Further, Defendants' argument that the alleged hostile actions were too isolated or sporadic ignores the allegations of the Second Amended Complaint, which detail numerous incidents involving multiple coworkers over a period of approximately four years. (*See generally* SAC.)

      Defendants' arguments that the Second Amended Complaint does not sufficiently allege causation are also unpersuasive. As to Garcia's hostile work environment claim on the basis of race, the Second Amended Complaint alleges that both Cyphers and Durand made offensive statements specifically referencing race and ethnicity. (*See, e.g.*, SAC ¶ 13 (alleging that Cyphers used racial slurs); *id.* ¶ 20 (alleging that Durand said "Blacks will never amount to anything" and "[a]ll of the Spanish are illegals").) As to Garcia's retaliatory hostile work environment claim, as noted above, the Second Amended Complaint alleges that Barlowe specifically asked Hervan how to "get rid" of Garcia after Durand resigned in the face of Garcia's complaints about her alleged racially hostile behavior. (*Id.* ¶ 28.)

### iii.   *NYSHRL Hostile Work Environment Claim*

      Hostile work environment claims brought under the NYSHRL apply the same standard as those brought under Title VII, *Banks*, 81 F.4th at 261–62, with one notable exception: on October 11, 2019, the New York legislature amended N.Y. Exec. Law § 296 to remove the "severe or pervasive" requirement for discrimination claims brought under the NYSHRL. *See* N.Y. Exec. Law § 296(1)(h) (creating a cause of action for harassment claims "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims"); *Maiurano v. Cantor Fitzgerald Secs.*, No. 19-cv-10042, 2021 WL 76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021).

Since I have already found that the Second Amended Complaint states a claim for hostile work environment under Title VII, I also find that it states a claim under the more permissive NYSHRL standard. *See supra* Discussion Section II.B.ii.

### iv.  Imputation of Conduct to Westhampton Primary Care

When a plaintiff sues an employer for hostile work environment based on the conduct of a co-worker, the plaintiff "must show . . . a specific basis exists for imputing the objectionable conduct to the employer." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015). "An employer's liability for hostile work environment claims depends on whether the underlying harassment is perpetrated by the plaintiff's supervisor or [the plaintiff's] non-supervisory co-workers." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015). "When the harassment is attributable to a co-worker, . . . the employer will be held liable only for its own negligence." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998). In such cases, the plaintiff must show either (1) that the "employer failed to provide a reasonable avenue for complaint" or (2) that the employer "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762. In order to establish employer liability on a "fail[ure] to take appropriate remedial action" theory, the plaintiff must show (1) that "*someone* had actual or constructive knowledge of the harassment," (2) that "the knowledge of this individual can be imputed to the employer," and (3) that "the employer's response, in light of that knowledge, was unreasonable." *Id.* at 763 (emphasis in original).

Contrary to Westhampton Primary Care's assertion that Garcia "fails to allege that SUNY provided no avenue for complaint or even that SUNY had knowledge of the allegedly

36

discriminatory behavior and failed to act" (Westhampton Primary Care Mem. at 9), the Second

Amended Complaint *does* allege that supervisory employees at Westhampton Primary Care were

on notice of Garcia's complaints and did not act reasonably in addressing them. Specifically, it

alleges the following: (1) that in 2020 after hearing racially biased statements by Cyphers,

Crump alerted "upper management" of the statements (SAC ¶ 13); (2) that in 2021 when Garcia

complained to Sardella, the Nursing Supervisor, regarding Durand's inappropriate behavior,

Sardella dismissed the issue and "just told everybody to get along" (*id.* ¶ 16); (3) that, although

Durand resigned, Garcia expressed concern to Alessi, the Off-Site Manager, over the fact that

she was not disciplined and there was no investigation into her conduct (*id.* ¶ 36); and (4) that

Alessi was "dismissive" of Garcia's concerns about Durand potentially returning to

Westhampton Primary Care's network (*id.* ¶ 36). In any event, the Second Amended Complaint

alleges that Barlowe, as Garcia's "direct superior," was in a supervisory role, such that the Court

can impute her allegedly hostile conduct to the company. (*See id.* ¶ 12.) Accordingly, the Second

Amended Complaint adequately pleads that Westhampton Primary Care can be held liable for

the conduct alleged.

### B.  Retaliation Claims

As with Garcia's hostile work environment claims, Westhampton Primary Care moves to

dismiss Garcia's retaliation claims on the ground that they are untimely. Westhampton Primary

Care also moves to dismiss Garcia's retaliation claims on the ground that the Second Amended

Complaint does not allege a protected activity. The Individual Defendants argue that the Second

Amended Complaint does not state an aiding and abetting retaliation claim against Barlowe and

Alessi. All Defendants move to dismiss Garcia's retaliation claims on the ground that that the

Second Amended Complaint does not allege a sufficiently "material" adverse action. I address each argument below.

### i. Timeliness

Title VII's 300-day and the NYSHRL's three-year statutes of limitations likewise apply to Garcia's retaliation claims under those statutes, as does the "continuing violation" doctrine. *Banks*, 81 F.4th at 260; *see also* Discussion Section II.A.i. Accordingly, any alleged retaliatory acts occurring prior to December 9, 2021 are untimely under Title VII and any acts occurring prior to October 5, 2019 are untimely under the NYSHRL, unless the "continuing violation" doctrine applies to any otherwise untimely claims.

In the context of a retaliation claim, "a continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the defendant to continue unremedied for so long as to amount to a discriminatory policy or practice." *Massaro v. N.Y.C. Dep't of Educ.*, No. 21-266-cv, 2022 WL 1788203, at *2 (2d Cir. June 2, 2022) (summary order) (citing *Cornwell v. Robinson*, 23 F.3d 694,704 (2d Cir. 1994)); *see also Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) ("The doctrine applies to claims composed of a series of separate acts that collectively constitute one unlawful practice . . ."); *King v. Aramark Servs. Inc.*, 96 F.4th 546, 559 (2d Cir. 2024). Courts have emphasized that the "continuing violation" doctrine does not apply to "discrete unlawful acts, even where those discrete acts are part of a serial violation," but rather to "claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Massaro*, 2022 WL 1788203, at *2 (citing *Morgan*, 536 U.S. at 114–15). If the court finds that the "continuing violation" doctrine applies, it "must then consider all

relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Banks*, 81 F.4th at 259.

"Discrete acts" not covered by the "continuing violation" doctrine—"such as termination, failure to promote, denial of transfer, or refusal to hire"—are "easy to identify." *Morgan*, 536 U.S. at 114; *see also Tassy*, 540 F. Supp. 3d at 235 ("A failure to train is a discrete act."), *aff'd*, 51 F.4th 521. "Each incident of discrimination . . . constitutes a separate actionable unlawful employment practice" under Title VII. *Morgan*, 536 U.S. at 114. "Discrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin v. Port Auth. of N.Y. and N.J.*, 685 F.3d 135, 157 (2d Cir. 2012).

In her opposition brief, Garcia identifies the following alleged retaliatory acts:

(1) Durand's statement that she was "coming for [Garcia's] blood" and "would take [Garcia] down" on October 7, 2021 (Opp'n at 16; SAC ¶ 23);

(2) Defendants' "fail[ure] to discipline [Durand] or note in her separation form that she's not subject to rehire thereby creating a situation where [Garcia] may have to work with her in the future" on October 18, 2021 (Opp'n at 17; SAC ¶¶ 36, 46).[10]

(3) Barlowe's solicitation and acts of pressuring co-workers to submit negative information to use as a basis to fire Garcia from October 2021 to November 2021 (Opp'n at 16; SAC ¶¶ 27–31);

(4) Barlowe's active monitoring of Garcia to find a basis for termination from October 2021 to at least November 2021 (Opp'n at 16; SAC ¶¶ 30, 33, 37);

(5) Barlowe's deliberate assignment of Garcia to the late shift in violation of company policy and union rules in late-October 2021 (Opp'n at 16; SAC ¶ 34);

---

[10] Garcia's opposition brief references Barlowe's separation from the company and the potential to be rehired. Based on the facts alleged in the Second Amended Complaint, however, I understand this to be an error and that Garcia is actually referring to Durand, who voluntarily resigned in October 2021. (SAC ¶ 21.)

(6) Barlowe's statements to Garcia's coworkers that Garcia's "toxicity" was the cause of other employees' departures on October 20, 2021 (Opp'n at 16; SAC ¶¶ 35, 39);

(7) Barlowe's change in demeanor toward Garcia around October 2021 (Opp'n at 16; SAC ¶ 38);

(8) Defendants' general creation of a "stressful environment" for Garcia from October 2021 to November 2021 (Opp'n at 16–17; SAC ¶ 40);

(9) Barlowe's act of falsely blaming an incorrect COVID test result on Garcia shortly after Garcia returned from her leave of absence on June 28, 2022 (Opp'n at 17; SAC ¶ 42);

(10) Barlowe's steps to block Garcia from a promotion in July 2022 (Opp'n at 17; SAC ¶ 43); and

(11) Barlowe's demand that one of Garcia's coworkers stop speaking with her in March 2023 (Opp'n at 17; SAC ¶ 44).

Under the NYSHRL, Garcia's retaliation claims based on all of this alleged conduct are timely because the alleged retaliatory actions occurred on or after October 5, 2019. Under Title VII, the only timely retaliation claims arise out of Barlowe's alleged acts of falsely blaming Garcia for an incorrect COVID test result shortly after June 28, 2022, blocking Garcia from a promotion in July 2022, and demanding that one of Garcia's coworkers stop speaking with her in March 2023.

With respect to Garcia's Title VII retaliation claim, I find that the "continuing violation" doctrine applies to some, but not all, of the otherwise untimely alleged actions, as follows:

First, the "continuing violation" doctrine *does not apply* to the allegation that Durand said that she was "coming for [Garcia's] blood" and "would take [Garcia] down" on October 7, 2021. (SAC ¶ 23.) Notably, this comment was made by Durand, who is not alleged to have perpetrated any of the timely acts of retaliation. *See Dziedzic*, 648 F. App'x at 127–28 ("continuing violation" doctrine did not apply where untimely sexual joke "was made by different co-workers

40

in a different section of the paint department than the [timely] harassment" alleged). Thus, Garcia's retaliation claim with respect to this alleged act of retaliation remains untimely.

Second, and for similar reasons, the "continuing violation' doctrine *does not apply* to the allegation that Defendants failed to discipline Durand or note in her separation form that Durand is not subject to rehire thereby creating a situation where Garcia may have to work with her in the future on October 18, 2021. (SAC ¶¶ 36, 46.) This allegation concerns action (or, more precisely, inaction) by management with respect to Durand, not Barlowe's actions against Garcia. *See Dziedzic*, 648 F. App'x at 127–28. Accordingly, Garcia's retaliation claim with respect to this alleged act of retaliation also remains untimely.

Third, the "continuing violation" doctrine *does apply* to the series of allegations concerning actions taken by Barlowe following Garcia's reports to management of Durand's racially hostile behavior around October 2021. (SAC ¶¶ 27–31, 33–35, 37–40, 42–44.) These otherwise untimely alleged actions were perpetrated against Garcia by the same individual who perpetrated the timely alleged actions—Barlowe. Likewise, these alleged actions are similar in character to the alleged timely actions. *See Bonterre*, 2021 WL 4060358, at *3. Therefore, these allegations all form part of the alleged timely retaliatory conduct.

### ii. *Title VII Retaliation Claim*

Under Title VII's antiretaliation provision, it is unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie claim for retaliation, a plaintiff must "demonstrate that (1) she

engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr*, 76 F.4th at 180 (Title VII retaliation case citing 42 U.S.C. § 2000e-3(a)).

With respect to the first prong, Westhampton Primary Care's argument that the Second Amended Complaint fails to plead a protected activity is unavailing. The Second Amended Complaint plausibly alleges that Garcia engaged in the following protected activities: (1) in October 2021 and November 2021, Garcia lodged multiple complaints to Barlowe, Alessi, and her Union Representative regarding Durand's alleged racially hostile behavior and threats against Garcia (SAC ¶¶ 20–25, 29, 36); and (2) on October 5, 2022, Garcia filed complaints with the EEOC and New York State Division of Human Rights (*id.* ¶ 4). As I have found, *supra* at Discussion Section II.A.ii, the Second Amended Complaint plausibly alleges that the conduct by Durand and others constituted a racially hostile work environment; thus, Garcia's complaints about that conduct constitute "oppos[ition] [to] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). Further, Title VII's antiretaliation provision covers both formal EEOC complaints as well as informal complaints to superiors about alleged discriminatory behavior. 42 U.S.C. § 2000e–3(a); *see Townsend*, 679 F.3d at 48 (holding that protected activities include "oppos[ition] [to] any practice made an unlawful employment practice" under Title VII); *Rivera v. JP Morgan Chase*, 815 F. App'x 603, 607 (2d Cir. 2020) ("The district court properly concluded that Rivera's complaint to human resources and his EEOC complaint were protected activity.").

42

With respect to the second prong of a Title VII retaliation claim, the Second Amended Complaint plausibly alleges that Defendants were aware of Garcia's protected activities, in particular because Garcia complained to superiors (Barlowe and Alessi) at Westhampton Primary Care and StaffCo. (SAC ¶¶ 20–25, 29, 36.) Furthermore, because an EEOC charge is served on the employer within 10 days of the filing of the charge, the October 5, 2022 EEOC charge filed by Garcia was necessarily served on Westhampton and StaffCo.[11]

With respect to the third prong of a Title VII retaliation claim, the Second Amended Complaint plausibly alleges the following retaliatory actions:

(1) Barlowe's solicitation and act of pressuring co-workers to submit negative information to use as a basis to fire Garcia from October 2021 to November 2021 (Opp'n at 16; SAC ¶¶ 27–31);

(2) Barlowe's active monitoring of Garcia to find a basis for termination from October 2021 to at least November 2021 (Opp'n at 16; SAC ¶¶ 30, 33, 37);

(3) Barlowe's deliberate assignment of Garcia to the late shift in violation of company policy and union rules in late-October 2021 (Opp'n at 16; SAC ¶ 34);

(4) Barlowe's statements to Garcia's coworkers that Garcia's "toxicity" was the cause of other employees' departures on October 20, 2021 (Opp'n at 16; SAC ¶¶ 35, 39);

(5) Barlowe's change in demeanor toward Garcia around October 2021 (Opp'n at 16; SAC ¶ 38);

(6) Defendants' general creation of a "stressful environment" for Garcia from October 2021 to November 2021 (Opp'n at 16–17; SAC ¶ 40);

(7) Barlowe's act of falsely blaming an incorrect COVID test result on Garcia shortly after Garcia returned from her leave of absence on June 28, 2022 (Opp'n at 17; SAC ¶ 42);

---

[11] United States Equal Employment Opportunity Commission, What You Can Expect After a Charge is Filed, https://www.eeoc.gov/employers/what-you-can-expect-after-charge-filed ("When a charge is filed against an employer or other entity . . . the EEOC will notify the Respondent within 10 days.") (last accessed July 28, 2025).

(8) Barlowe's steps to block Garcia from a promotion in July 2022 (Opp'n at 17; SAC ¶ 43); and

(9) Barlowe's demand that one of Garcia's coworkers stop speaking with her in March 2023 (Opp'n at 17; SAC ¶ 44).

Contrary to Defendants' assertions, the Second Amended Complaint has plausibly alleged that these actions, taken together, could well "dissuade a reasonable worker from making or supporting a charge of discrimination." *Muldrow*, 601 U.S. at 348 (addressing Title VII's anti-retaliation provision (citing *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53, 68 (2024)).

With respect to the fourth prong, the Second Amended Complaint plausibly alleges a causal connection between the two identified protected activities above and the alleged retaliatory actions. First, the Second Amended Complaint establishes a causal connection between Garcia's numerous complaints in October and November 2021 regarding Durand's behavior and other alleged racially hostile actions continuing from that time through March 2023. The temporal proximity between the Garcia's October and November 2021 complaints and subsequent, frequent alleged racially hostile actions by Barlowe from October 2021 to July 2022 (when Barlowe sought to block Garcia's promotion) is enough at this stage to plausibly allege causation. *See Zann Kwan*, 737 F.3d at 845 ("The three-week period from Kwan's complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."). Second, some of Barlowe's actions around this time—in particular, her complaints to coworkers about Garcia's "toxicity" and statements indicating that she would like to "get rid" of Garcia—are direct evidence of Barlowe's intent to retaliate against Garcia for making complaints about co-workers who had left Westhampton Primary Care, including Durand. SAC ¶¶ 28, 35; *see Porter*, 92 F.4th at 149. Such allegations suggesting

44

retaliatory intent support a causal connection between Garcia's October and November 2021 complaints and retaliatory conduct through the March 2023 attempts by Barlowe to stop Garcia from speaking to Dirma about experiences with alleged racial discrimination at Westhampton Primary Care. Third, the Second Amended Complaint also plausibly alleges a causal relationship between Garcia's filing of the EEOC charge on October 5, 2022 and Barlowe's March 2023 to interfere with Garcia's conversations with Dirma about alleged racial discrimination at the company, based on the temporal proximity of these events. SAC ¶¶ 4, 44; *see Zann Kwan*, 737 F.3d at 845.[12]

Thus, to the extent Garcia intends to bring retaliation claims based on such a theory, this claim is implausible and therefore dismissed.

Accordingly, the Second Amended Complaint pleads plausible Title VII retaliation claims relating to Barlowe's attempts to "get rid" or Garcia from approximately October 2021 to July 2022 as well as Barlowe's attempt to stop Dirma from speaking to Garcia in March 2023. Any other alleged retaliatory acts occurring prior to December 9, 2021 are untimely under Title VII and any acts occurring prior to October 5, 2019 are untimely under the NYSHRL.

---

[12] By contrast, the Second Amended Complaint does not allege a causal relationship between Garcia's filing of the EEOC charge on October 5, 2022 and the alleged attempts by Barlowe to "get rid" of Garcia from October 2021 to roughly July 2022 for the simple reason that these alleged retaliatory events happened *before* the protected activity. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

### iii.   *NYSHRL Retaliation Claims*

Retaliation claims under the NYSHRL follow the same framework as Title VII claims discussed above. *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 452 n.4 (S.D.N.Y. 2024). However, courts have generally agreed that the newly amended NYSHRL contains a more "more liberal" standard with respect to the adverse action requirement. *See Menos v. Uncle Nearest, Inc.*, No. 22-cv-1449, 2025 WL 917347, at *16 (E.D.N.Y. Mar. 25, 2025). Accordingly, since I have found that Second Amended Complaint states a retaliation claim under the more restrictive Title VII standard, I also find that it states a claim under the more permissive NYSHRL standard, based on the same theories described above at Discussion Section II.B.ii.

## CONCLUSION

Defendants' Motions to Dismiss the Second Amended Complaint (ECF Nos. 38, 39) are granted in part and denied in part, as set forth in detail above. By September 26, 2025, Garcia may file a third amended complaint to plead facts alleging that Barlowe and/or Alessi may be held primarily liable as "employers" under the NYSHRL. In the event that Garcia chooses to amend, by October 10, 2025, Defendants shall file any pre-motion letter seeking dismissal of the NYSHRL claims against Barlowe and Alessi in the third amended complaint. Garcia shall file any response by October 17, 2025. Any pre-motion letters must set forth the parties' positions concerning the applicable legal standard for determining when and individual is an "employer"

under the NYSHRL and must specifically address the New York Court of Appeals' decisions in

*Patrowich*, *Griffin*, and *Bloomberg* discussed in this Opinion and Order.

Dated:  Central Islip, New York
         September 10, 2025

                                        */s/ Nusrat J. Choudhury*
                                        NUSRAT J. CHOUDHURY
                                        United States District Judge